644 A.2d 616

IN MATTER OF THE COMMISSIONER OF INSURANCE'S IS-
SUANCE OF ORDERS A–92–189 AND A–92–212, AND ADOPTION
OF N.J.A.C. 11:3–20.5 AND ADOPTION OF N.J.A.C. 11:3–20—
APPENDIX.

Superior Court of New Jersey
Appellate Division

Argued April 7, 1993—Decided June 13, 1993.

Before Judges KING, BRODY and THOMAS.

*Thomas P. Weidner* for appellants State Farm Mutual Automobile Insurance Company, Selective Insurance Company of America

and Hanover Insurance Company (*Jamieson, Moore, Peskin & Spicer,* attorneys; *Deborah T. Poritz,* of counsel and on the brief and *Lee R. Jamieson,* on the brief).

*Marilyn S. Silvia,* Chief Deputy Attorney General, for respondent Department of Insurance (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel and *Katherine G. Motley,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

This appeal concerns whether the Commissioner of Insurance exceeded his authority in promulgating a regulation, *N.J.A.C.* 11:3–20.5(e), under the Excess Profits Law, *N.J.S.A.* 17:29A–5.6 to –5.16, intended to implement the mandate of the Fair Automobile Insurance Reform Act of 1990, *N.J.S.A.* 17:33B–1 to –62; *L.*1990, *c.* 8, (the FAIR Act) requiring that automobile insurers not pass through to insureds the cost imposed on insurers of erasing about one-half of the $3.3 billion deficit accumulated by the New Jersey Automobile Full Insurance Underwriting Association (JUA). The FAIR Act imposes a 5% surtax on automobile insurers for the years 1990–1992 and a 2.7% assessment (adjustable annually) on all property and casualty insurers for the years 1990–1997. The FAIR Act has "anti-pass-through" provisions which are designed to prevent insureds from paying for the JUA bailout. Our Supreme Court upheld the facial constitutionality of the FAIR Act against the challenge that it was confiscatory but only by construing the FAIR Act to require the Commissioner to set rates high enough to insure a "constitutionally adequate" rate of return. *State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 590 *A.*2d 191 (1991). The effect of the Court's decision was to preclude insurers from including the surtax and assessment in the rate base unless absolutely necessary to achieve a fair and reasonable rate of return.

The question before us is whether the Commissioner exceeded his authority in prohibiting automobile insurers from deducting the surtax and assessment as an expense in their excess profit report unless the Commissioner permitted the insurer to include the surtax and assessment in its rate filing. The Commissioner justifies his regulatory action as necessary to implement the intent of the Legislature in adopting the FAIR Act prohibition against "pass-throughs." Appellants, three automobile insurance companies, claim that this action violates both the express language of, and the intent of, the Excess Profits Law which attempts to measure accurately an automobile insurer's actual profits. Appellants also contend that the regulation is unconstitutional as confiscatory on its face. The Commissioner contends that the appeal is nonjusticiable and should be dismissed because none of the appellants have ever showed excess profits and have not been harmed by the new regulation.

We find that the insurers have a right to challenge the regulation on its face, even though they have not realized any "excess profit." We uphold the validity of the regulation which denies the insurers the right to include and "pass through" the surtaxes and assessments as expenses for purposes of calculating excess profits. We also conclude that the regulation is not facially confiscatory.

I

On June 19, 1991 the Commissioner issued Bulletin No. 91–8, which informed all automobile insurers that neither the 5% surtax nor the 2.7% assessment should be included as an expense in calculating the Excess Profits Report due July 1, 1991 (for calendar year 1990). Two of the appellants here, Selective Insurance Company of America (Selective) and Hanover Insurance Company (Hanover) appealed. On July 2, 1992, in an unpublished opinion, we invalidated Bulletin No. 91–8 on the ground that the declared policy should have been promulgated pursuant to the rulemaking process. We did not reach the merits. *See In re Comm'r of Ins.'s*

*Issuance of Bulletin No. 91–8,* No. A–6099–90 (App.Div. July 2, 1992).

In fact, the Commissioner had proposed and actually adopted the new rule several weeks before we decided the above case. On February 18, 1992 the Commissioner proposed to amend *N.J.A.C.* 11:3–20.5 to codify Bulletin No. 91–8's policy of prohibiting insurers from treating assessments and surtaxes as expenses for purposes of calculating excess profits. 24 *N.J.R.* 529 (Feb. 18, 1992). On May 28 and June 11, 1992, respectively, the Commissioner issued orders No. A92–189 and No. A92–212, which implemented the change. The regulation, now codified at *N.J.A.C.* 11:3–20.5(e), as well as technical revisions to the excess profit report form, were adopted on June 15, 1992. 24 *N.J.R.* 2264 (June 15, 1992). Selective and Hanover, this time joined by State Farm Mutual Automobile Insurance Company (State Farm), filed this notice of appeal on July 30, 1992.

## II

A brief review of the relevant regulatory insurance statutes and the Commissioner's interpretation of them is helpful.

### A. *New Jersey Automobile Insurance Rate Regulation*

Since 1944 automobile insurance companies doing business in New Jersey have been subject to prior approval of their rates. *N.J.S.A.* 17:29A–1. Rates must be high enough to ensure the safety and soundness of the insurance company, but not unreasonably high. *N.J.S.A.* 17:29A–4. The Commissioner must approve rates that are "reasonable and adequate, and not unfairly discriminatory," taking into account a "reasonable profit for the insurer." *N.J.S.A.* 17:29A–11.

Since 1973 "reasonable and adequate" rates have been fixed with reference to the Clifford Formula, developed by Justice Clifford when he was the Commissioner of Insurance. Under the Clifford Formula, rates are fixed so that an insurance company can earn a post-tax profit of 3.5% of its premiums. *In re*

*Application of Ins. Rating Bd.,* 63 *N.J.* 413, 417, 307 *A.*2d 604 (1973) (upholding the Clifford Formula). Appellants and the Commissioner agree that this equals a pre-tax return of 5.3%. *See* 22 *N.J.R.* 2082, 2083 (July 16, 1990). The Clifford Formula, now set forth in administrative regulation *N.J.A.C.* 11:3–16.10, does not allow insurers to include all expenses in the rate base. Even before adoption of the FAIR Act, the regulation excluded fines, lobbying expenses, charitable and political contributions, punitive damage awards, and advertising and other expenses incurred in connection with proposed changes to insurance regulations from the rate base. *N.J.A.C.* 11:3–16.10(b)(8).

## B. *The Excess Profits Law*

An insurer must predict future performance in order to establish a premium that will generate the appropriate rate of return. Frequently, actual performance differs from the prediction, and an insurer may enjoy more or less profit than anticipated. The Excess Profits Law reflects the Legislature's determination that excess profits be returned to policyholders.

The Legislature enacted the first Excess Profits Law in 1983. *L.*1983, *c.* 357 (codified at *N.J.S.A.* 17:29A–5.2 to –5.5 and repealed by *L.*1988, *c.* 118, § 12). *See American Employers' Ins. Co. v. Commissioner of Ins.,* 236 *N.J.Super.* 428, 430–31, 566 *A.*2d 202 (App.Div.1989). The major relevant difference between the original law and the Excess Profits Law enacted in 1988, *L.*1988, *c.* 118 (codified at *N.J.S.A.* 17:29A–5.6 to –5.16), is a reduction in the permitted excess profit from 5% to 2.5% of earned premiums. *N.J.S.A.* 17:29A–5.8. The 1988 Excess Profits Law was enacted at the same time as the comprehensive reforms included in the Automobile Insurance Reform Act of 1988, *L.*1988, *c.* 118. *See In re Dep't of Ins.'s Order Nos. A89–119 and A90–125,* 129 *N.J.* 365, 373, 609 *A.*2d 1236 (1992). One major change of the Reform Act was the creation of "flex rating," which allows an insurance company to increase premiums by the annual increase in the Consumer Price Index plus 3% without the Commissioner's prior approval. *Id.* at 373–74, 609 *A.*2d 1236. However, this greater

potential for profit was tempered by the stricter excess profits limitation of 2.5%, thereby insuring "that the industry does not abuse this rate-making flexibility and that any rate increase is justified." *Id.* at 373, 609 *A.*2d 1236, quoting *Governor's Reconsideration and Recommendation Statement,* Senate No. 2637, *L.*1988, *c.* 119.

According to Governor Kean, the 1988 Excess Profits Law was designed to "assure that a complete and accurate assessment of profits and losses is presented by insurers." *Governor's Conditional Veto Message,* Senate No. 3090 (Nov. 9, 1987). As explained by the New Jersey Department of Insurance's 1989 Annual Report, the purpose is to insure that an insurance company that makes an unusually large profit returns the excess to its policyholders. The parties here agree that a profit is excess if it exceeds 7.8% of premiums—the 5.3% pre-tax return allowed by the Clifford Formula plus the 2.5% above that permitted by the Excess Profits Law.

With limited exceptions, automobile insurers must file a report with the Commissioner on or before July 1 of each year, reflecting profits and losses for the several preceding years. *N.J.S.A.* 17:29A–5.7. Excess profits are deemed to exist when, for the three calendar years immediately preceding the date of the profits report, the sum of an insurer's "total actuarial gain" and "excess investment income" for all private passenger automobile coverages combined exceeds 2.5% of earned premiums. *N.J.S.A.* 17:29A–5.8; *N.J.A.C.* 11:3–20.7(a).[1] "Actuarial gain" means underwriting income less the allowance for profit and contingencies, which amount may be positive or negative. *N.J.S.A.* 17:29A–5.6(b). "Total actuarial gain" is the sum of the actuarial gains for the

---

[1] The amount of profit allowed by the Clifford Formula is calculated into "actuarial gain," so that a profit is "excess" only if it exceeds 7.8% of earned premium (5.3% pre-tax allowed by Clifford Formula plus 2.5% allowed by Excess Profits Law). The actual mechanics of this statute need not greatly concern us, since the parties agree that profits are excess when they exceed 7.8% of premiums.

three calendar-accident years immediately preceding the due date of the profits report required by statute, less certain adjustments. *N.J.S.A.* 17:29A–5.6(*l*).

Under the statute, an insurer's expenses are deducted from actuarial gain. As noted, one component of actuarial gain is underwriting income. *N.J.S.A.* 17:29A–5.6(b). To arrive at underwriting income one subtracts several expenses from premiums earned, including "other expenses." *N.J.S.A.* 17:29A–5.6(m). These "other expenses" are itemized separately and include such things as commissions, brokerage fees and "taxes, licenses and fees." *N.J.S.A.* 17:29A–5.7(c)(3)(b).

## C. *The FAIR Act*

One of the major purposes of the FAIR Act was to pay off the JUA's accumulated debt of over $3.3 billion. *State Farm v. State, supra*, 124 *N.J.* at 43, 590 *A.*2d 191. The Legislature targeted insurance companies to pay off a substantial portion of the debt through a 5% surtax on automobile insurance premiums for the years 1990, 1991 and 1992, designed to yield $300,000,000; and assessments on all property and casualty insurers of $160,000,000 per year for eight years (1990–1997), which computes to an annual assessment of 2.7% of net premiums of property-casualty insurers. *N.J.S.A.* 17:33B–49 (surtax); *N.J.S.A.* 17:30A–8(a)(10) (assessment); *State Farm v. State, supra*, 124 *N.J.* at 43–44, 590 *A.*2d 191. With respect to the surtax, the FAIR Act directs that the Commissioner "shall take such action as is necessary to insure that private passenger automobile insurance policyholders *shall* not pay for the surtax." *N.J.S.A.* 17:33B–51 (emphasis added). With respect to the assessment, the FAIR Act states that no property or casualty insurer "*shall* impose a surcharge on the premiums of any policy to recoup assessments...." *N.J.S.A.* 17:30A–16(b) (emphasis added).

Both of these "anti-pass-through" provisions have been construed to preclude these expenses in standard rate-making. *State Farm v. State, supra*, 124 *N.J.* at 53, 62, 590 *A.*2d 191. However, the FAIR Act also states: "To provide a healthy and competitive

automobile insurance system in this State, automobile insurers are entitled to earn an adequate rate of return through the rate[-]making process." *N.J.S.A.* 17:33B–2(g). In order to give effect to this purpose of the FAIR Act, and to insure that rates are constitutionally adequate, the Supreme Court has construed the Act to require "the Commissioner to consider the surtaxes and assessments in affording rate relief to an insurance company otherwise unable to earn a fair rate of return." *State Farm v. State, supra,* 124 *N.J.* at 62, 590 *A.*2d 191.

### D. *Proceedings Leading up to Adoption of the Challenged Regulation*

On May 15, 1989 Commissioner of Insurance Kenneth Merin adopted regulations to implement the 1988 Excess Profits Law. 21 *N.J.R.* 1335 (May 15, 1989). The regulations closely tracked the statutory language. *N.J.A.C.* 11:3–20.1 to –20.12, *reprinted in* 21 *N.J.R., supra,* at 1339–40. Taxes, licenses and fees were treated as expenses, like general expenses or broker's commissions. 21 *N.J.R., supra,* at 1353, Exhibit 7, Part 2, Item 6; 21 *N.J.R., supra,* at 1357, Exhibit 10, Item 11.

Bulletin 91–8, issued by Commissioner Fortunato on June 19, 1991, informed all automobile insurers that the surtax and assessment could not be included as an expense in calculating excess profits because the FAIR Act instructed the Commissioner to insure that policyholders do not pay for the surtaxes or assessments. The Commissioner explained his position when he first proposed *N.J.A.C.* 11:3–20.5(e):

> In accordance with these [anti-pass-through provisions of the FAIR Act], the Department adopted rules that generally prohibit insurers from including the assessment and surtax as expenses in requested private passenger automobile insurance rates (*see N.J.A.C.* 11:3–16). The determination of excess profits involves a retrospective review of an insurer's rates for private passenger automobile insurance for the immediately preceding three years. The data in the Excess Profits Report therefore must reflect the insurer's condition for the relevant period. Including assessments and surtaxes in the Excess Profits Report which were not reflected in the insurer's approved private passenger automobile insurance rates for the relevant period will distort the insurer's excess profits results. Further, including assessments and surtaxes as expenses, which were not reflected in the insurer's approved rates pursuant to *N.J.A.C.* 11:3–16.11, could result in

policyholders indirectly paying the assessment or surtax through a reduction or elimination of the return of excess profits which otherwise would have been returned, in contravention of *N.J.S.A.* 17:30A–16 and 17:33B–51. The Department therefore believes it appropriate to provide that insurers may not include those assessments and surtaxes as expenses for purposes of the excess profits calculation.

[24 *N.J.R.* 523, 530 (Feb. 18, 1992).]

Comments in opposition to the proposed rule raised essentially the same arguments presented by the carriers on this appeal. To summarize:

(1) The proposed rule was inconsistent with the express language of the Excess Profits Law permitting deduction of taxes and fees;

(2) The proposed rule would have the effect of reducing permitted profit far below that expressly allowed by the Excess Profits Law, in some cases artificially requiring an auto insurer to show a profit when, in fact, it had a loss;

(3) The proposed rule was inconsistent with the intent of the Excess Profits Law to· allow a modest return and to protect consumers only against unreasonable profits;

(4) The rule was unnecessary to protect policyholders from paying for the surtax and assessment, since regulations adopted to implement the anti-pass-through provisions of the FAIR Act already did that.

[24 *N.J.R.* 2264–65 (June 15, 1992).]

The rule as actually adopted states:

No expenses included in the Excess Profits Report shall include assessments paid to the New Jersey Property Liability Insurance Guaranty Association pursuant to *N.J.S.A.* 17:30A–8a(9) or surtaxes paid pursuant to *N.J.S.A.* 17:33B–49, except to the extent the insurer was permitted to reflect the assessments and surtaxes in its approved rates for private passenger automobile insurance pursuant to *N.J.A.C.* 11:3–16.11 and for any of the three years reported in the Excess Profits report.

[*N.J.A.C.* 11:3–20.5(e).]

Order A92–189, dated May 28, 1992, prohibits insurers from deducting the assessment and surtax for the report due July 1, 1992 (reflecting 1991 excess profits) and, in addition, requires insurers to refile the Excess Profits Report due July 1, 1991 (for calendar year 1990) to not reflect the surtax and assessment.

## III

■ The Commissioner urges that we decline to reach the merits because none of the appellants could actually show an excess profit on their July 1, 1992 reports, even had they deducted the surtax and assessment. Appellants respond that a member of a regulated industry may always appeal the promulgation of a rule by the agency which regulates the industry and that adoption of a rule is a final decision which is appealable as of right: not only is the "facial validity of *N.J.A.C.* 11:3–20.5 ripe for judicial review, but adjudication of this issue is important for the insurance industry." Appellants point out that all insurers will have to file excess profits reports on July 1, 1993, covering the years 1990–1992, which will be the first report to fully reflect the impact of the surtax and assessment. Companies should not have to await an order to refund claimed excess profits before challenging the facial validity of the rule. Further, argue appellants, excess profits reports are utilized in other regulatory proceedings, "and therefore any inaccuracies therein have widespread ramifications. Moreover, given the publicity surrounding insurance rates over the past several years, insurers and the public are entitled to an accurate reflection of actual insurer profits in the Excess Profits Reports on file with the Department." Finally, appellants claim that "a company has the right to know whether it can include surtax and assessment expenses in the excess profits calculation in order to effectively plan its business affairs."

We reject the Commissioner's argument on this point. Appeals may be taken as of right "to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer. . . ." *R.* 2:2–3(a)(2). Indeed, regulated industries and others affected by administrative rules have been encouraged to bring facial challenges within forty-five days after adoption of a rule. *Bergen Pines County Hosp. v. Department of Human Servs.,* 96 *N.J.* 456, 476, 476 *A.*2d 784 (1984); *In re Township of Warren,* 247 *N.J.Super.* 146, 157–58, 588 *A.*2d 1227 (App.Div.1991), *certif. denied,* 127

N.J. 557, 606 A.2d 369 (1992). Failure to make a timely challenge may result in dismissal of the appeal if the regulation is relied upon by affected parties. *Id.* at 158, 588 A.2d 1227.

The Commissioner seems to contend that appellants lack standing because they have not been adversely affected financially by the rule. The Commissioner principally relies on two significant standing cases but both emphasize our liberal rules on standing and a preference for reaching the merits, unencumbered by procedural technicalities. *N.J. Chamber of Commerce v. N.J. Election Law Enforcement Comm'n,* 82 N.J. 57, 68, 411 A.2d 168 (1980); *Crescent Park Tenants Ass'n v. Realty Equities Corp.,* 58 N.J. 98, 107–08, 275 A.2d 433 (1971). We conclude that automobile insurers regulated by the Department have a cognizable stake in the facial validity of the Department's regulations. We find the challenge appropriately justiciable.

## IV

Appellants contend that the Commissioner exceeded his authority by adopting a regulation which has the effect of amending the Excess Profits Law. Appellants argue that both the express language of and the intent behind the Excess Profits Law is to require insurers to refund *actual* excessive profits to policyholders. For that reason, the law entitles insurers to deduct actual expenses, including all taxes, from their income calculation. If the Legislature intended that the assessment and surtax not be deductible from the Excess Profits Law, it would have amended that law when it adopted the FAIR Act. Appellants urge that the Commissioner erred in effectively assuming that the FAIR Act impliedly repealed those portions of the Excess Profits Law which allow deduction of all taxes.

The Commissioner insists that he is merely executing the command of the FAIR Act, that policyholders *shall* not pay for the cost of eliminating the JUA deficit. In the Commissioner's view, policyholders will, to an extent, pay indirectly if the surtax and assessment is not excluded from the excess profits calculation. In

the Commissioner's eyes, the Excess Profits Law creates a "loophole" if he is not allowed to prohibit the deductibility of the surtax and assessment. He urges us to defer to the presumed validity of the regulation, giving due regard to his expertise.

Appellants in retort emphasize that rate-fixing—in which normally a surtax and assessment could not be included—serves a fundamentally different purpose from the Excess Profits Law, which is to give policyholders a benefit when a company's actual profit exceeds the statutory maximum. Appellants also dispute the Commissioner's insistence that policyholders end up paying for the surtax and assessments if these items are included in the excess profits calculation. According to appellants, "policyholders are not paying for surtaxes and assessments; rather the insured does not refund 'excess profits' that never existed." Appellants claim that the Commissioner's interpretation would allow policyholders to "receive a windfall check when the insurer [in fact] did not earn excess profits."

Administrative regulations are accorded a strong presumption of validity and reasonableness, *City of Newark v. Natural Resources Council in Dep't of Envtl. Protection,* 82 *N.J.* 530, 539, 414 *A.*2d 1304, *cert. denied,* 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980); *N.J. Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978). The party attacking an administrative regulation must demonstrate that it is arbitrary, capricious or otherwise unreasonable. *Ibid.* Because of this rebuttable presumption afforded administrative regulations, an *ultra vires* finding generally is disfavored. *Ibid.; In re N.J. Bd. of Pub. Utils.,* 200 *N.J.Super.* 544, 557, 491 *A.*2d 1295 (App.Div. 1985). In deciding whether an administrative regulation is authorized by the statute, "the reviewing court may look beyond the specific terms of the enabling statute to the statutory policy to be achieved by examining the entire statute in light of its surroundings and objectives." *N.J. Guild of Hearing Aid Dispensers v. Long, supra,* 75 *N.J.* at 561–62, 384 *A.*2d 795. Moreover, "the absence of an express statutory authorization in the enabling

legislation will not preclude an administrative agency acting where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation." *In re N.J. Bd. of Pub. Utils., supra,* 200 *N.J.Super.* at 557, 491 *A.*2d 1295.

Indeed, a court may not substitute its judgment regarding the wisdom of an administrative action for the judgment of the agency as long as the action is statutorily authorized and is reasonable. *K.P. v. Albanese,* 204 *N.J.Super.* 166, 176, 497 *A.*2d 1276 (App.Div.1985). As observed in *IFA Ins. Co. v. New Jersey Dep't of Ins.,* 195 *N.J.Super.* 200, 208, 478 *A.*2d 1203 (App.Div.), *certif. denied,* 99 *N.J.* 218, 491 *A.*2d 712 (1984), "[i]f there is any fair argument in support of the agency's action or any reasonable ground for difference of opinion among intelligent and conscientious officials, 'the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal.'" *Ibid.* (citing *Flanagan v. Civil Serv. Dep't,* 29 *N.J.* 1, 12, 148 *A.*2d 14 (1959)).

We are also mindful that "the opinion as to the construction of a regulatory statute of the expert administrative agency charged with the enforcement of that statute is entitled to great weight and is a 'substantial factor to be considered in construing the statute.'" *N.J. Guild of Hearing Aid Dispensers v. Long, supra,* 75 *N.J.* at 575, 384 *A.*2d 795 (quoting *Youakim v. Miller,* 425 *U.S.* 231, 235, 96 *S.Ct.* 1399, 1402, 47 *L.Ed.*2d 701 (1976)). *See In re Aetna Casualty Surety Co.,* 248 *N.J.Super.* 367, 376, 591 *A.*2d 631 (App.Div.), *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 1244, 117 *L.Ed.*2d 476 (1992) (the Commissioner's expertise in the field of insurance must be given great weight). Such deference may be even more appropriate in cases like this one which involve the construction of a new statute by its implementing agency. *N.J. Guild of Hearing Aid Dispensers v. Long, supra,* 75 *N.J.* at 575, 384 *A.*2d 795.

In this case, the mandate of the then newly-enacted FAIR Act could not be clearer. The Commissioner was compelled to

"take *such action as is necessary* to ensure that private passenger automobile insurance policyholders *shall* not pay for the surtax imposed pursuant to [*N.J.S.A.* 17:33B–49]." *N.J.S.A.* 17:33B–51 (emphasis added). The FAIR Act also provided that *no* insurer "shall impose a surcharge on the premiums of any policy to recoup assessments paid pursuant to [*N.J.S.A.* 18:30A–8(a)(9) ]." *N.J.S.A.* 17:30A–16(b). The Supreme Court, in *State Farm v. State, supra,* 124 *N.J.* at 58, 590 *A.*2d 191, found that these two provisions, standing alone, absolutely prohibited "pass throughs of surtaxes and assessments in the form of direct premium increases or direct rate relief." The Court ruled, however, that the FAIR Act conferred upon the Commissioner the necessary authority, when required, to satisfy the constitutional requirement that insurers receive a fair rate of return. *Ibid.*

Indeed, as the Court in *State Farm v. State* acknowledged, the Commissioner amended the regulations governing rate filings to establish a "special, separate rate-increase filing procedure for any insurer who believes that the effect of the surtaxes and assessments, in its particular case, is to preclude an adequate rate of return." *Id.* at 59, 590 *A.*2d 191; *see N.J.A.C.* 11:3–16.11. An insurer may not treat the surtaxes and assessments as expenses in the context of standard ratemaking unless it can demonstrate that they are otherwise unable to earn a constitutionally adequate rate of return.

Seemingly, none of the appellants have met the necessary constitutional burden. Of the appellants here, only State Farm and Selective filed for rate relief from surtaxes and assessments. Selective ultimately settled and no determination was made on its need for rate relief under the FAIR Act's constitutionality standards. State Farm withdrew its surtax and assessment rate filing just five weeks before the scheduled hearing in the OAL. However, on a later remand from the Superior Court, Chancery Division, an ALJ found that State Farm had earned an adequate rate of return in 1990 and 1991, even when the surtax and assessments were included in the profit calculation.

Appellants nonetheless seek to pass through FAIR Act surtaxes and assessments, to the extent their future excess profits reports indeed reflect an excess profit, by reducing or eliminating the return of excess profits to which policyholders may otherwise be entitled. If insurers are able to avoid the refund of excess profits by offsetting surtaxes and assessments as expenses in calculating excess profits when these expenses were not reflected in the insurer's approved rates, policyholders of the most profitable carriers are indirectly paying the insurers' surtaxes and assessments. In view of explicit commands of the Legislature to prevent direct pass-throughs, *N.J.S.A.* 17:30A–16(b) and 17:33B–51, we would strain logic to conclude that the Legislature intended to condone a leak by way of the Excess Profits Law which allowed for the indirect pass-through of surtaxes and assessments to policyholders of more profitable carriers.

Appellants also claim that *State Farm v. State* provides no support for the Commissioner's action in promulgating *N.J.A.C.* 11:3–20.5 because the Supreme Court there only held that insurers were prohibited from treating surtaxes and assessments as expenses for standard rate-making purposes. We think that the rate-making process and the calculation of excess profits are separate but complementary functions which pursue the common goal of assuring fair rates to policyholders. *See New Jersey Dep't of Ins. 1989 Annual Report.* The 1983 version of the Excess Profit Law was described as a "safeguard against the possibility that an auto insurer would reap unreasonably high profits. The law requires any auto insurer to refund to its policyholders premiums received in excess of an amount 5% higher than the profit margin *established in previous rate filings.*" *Governor's Conditional Veto Message,* Senate Bill No. 3090 (November 9, 1987) (emphasis added).

The role of excess profit reports as essentially a check on the ratemaking process is also supported by the definitions used in the Excess Profit Law. For example, the law defines "anticipated investment income" as "the amount obtained by multiplying

earned premium by the percentage of premium representing investment income and *used in the insurer's approved rate filings* ... to calculate the allowance for profit and contingencies." *N.J.S.A.* 17:29A–5.6(d) (emphasis added). Also, the law requires that the excess profits reports include "[a]llowance for profit and contingencies, calculated by multiplying the premiums earned by the profit and contingency factors authorized for use with the insurer's approved rate filings." *N.J.S.A.* 17:29A–5.7(c)(4). Indeed, appellant State Farm acknowledged in a letter by corporate counsel to the Commissioner on June 29, 1990 that "[t]he purpose of the excess profit law is to compare actual performance with the performance predicted in State Farm's last approved rate filing."

We conclude that the Commissioner had ample authority pursuant to the express command of the FAIR Act and the intent of the Excess Profit Law to promulgate *N.J.A.C.* 11:3–20.5. The Supreme Court in *State Farm v. State,* recognized that the FAIR Act should be "liberally construed as giving the Commissioner ample authority to ... achieve the legislative objective." 124 *N.J.* at 54, 590 *A.*2d 191. Likewise, the Commissioner has broad authority under the Excess Profits Law to promulgate regulations governing excess profits "that he deems necessary to implement the provisions of this act." *N.J.S.A.* 17:29A–5.16. The Commissioner is also expressly authorized to prescribe the "formats and media" of the excess profits reports. *N.J.S.A.* 17:29A–5.13.

While the Excess Profits Law provides that "general expenses" are to be included in excess profit reports, *N.J.S.A.* 17:29A–5.7(c)(3)(e), this does not mean that the Commissioner lacks the authority to exclude certain expenses the inclusion of which would fundamentally defeat the later, very specific legislative commands and purpose of the FAIR Act. Our courts have stressed that "[i]t is basic in the construction of legislation that every effort should be made to harmonize the law relating to the same subject matter." *State v. Green,* 62 *N.J.* 547, 554, 303 *A.*2d 312 (1973). When helpful in resolving uncertainties regarding statutory provisions, "[s]tatutes *in pari materia* are to be construed together."

*Id.* at 554–55, 303 *A.*2d 312; *see also Gorton v. Reliance Ins. Co.,* 77 *N.J.* 563, 391 *A.*2d 1219 (1978); *Garcia v. Snedeker,* 199 *N.J.Super.* 254, 489 *A.*2d 175 (App.Div.1985). Since the Excess Profits Law, like the statutory rate-making scheme, was designed to "protect members of the public from the danger of improper insurance rates," the law "should be given the fullest effect allowed by the statutory language unless an intent to provide an exemption from regulation clearly appears." *In re Allstate Ins. Co.,* 179 *N.J.Super.* 581, 591, 432 *A.*2d 1366 (App.Div.1981).

The statutory intent of the FAIR Act is most clear—surtaxes and assessments are not to be paid by policyholders unless necessary for the company to earn a constitutionally adequate rate of return. *See State Farm v. State, supra,* 124 *N.J.* at 62, 590 *A.*2d 191. Consistent with this directive, the Commissioner amended the rate-making regulations to confirm that the FAIR Act surtaxes and assessments could not be automatically incorporated into the expense base for determining rates. *N.J.A.C.* 11:3–16.10(b)(8)(vii). Because of the related function of the excess profit reports, the Commissioner correlatively recognized the need to harmonize the excess profit calculation with the treatment of expenses in the rate-making regulations. *See N.J.A.C.* 11:3–20.5(e). A contrary construction of the term "expenses" in the Excess Profit Law could lead to an anomalous result. An insurer which did not meet the constitutional threshold for a rate increase based on its need to pay surtaxes and assessments, could still be permitted to calculate the surtax and assessments in the expense base of its excess profit calculation and thus pass through the surtax and assessments as a reduction or elimination of refunds otherwise due policyholders. This would eviscerate the anti-pass-through provisions of the FAIR Act intended to protect policy-holders from paying insurers' FAIR Act obligations.

We conclude that the Commissioner's authority to "take such action as is necessary" to achieve the legislative objective of the FAIR Act, combined with his authority to enact necessary excess profit regulations, made his action in promulgating *N.J.A.C.* 11:3–

20.5 reasonable. We recognize that an amendment and clarification of the language of *N.J.S.A.* 17:29A–5.7(c)(3)(b) ("taxes, license and fees") in the Excess Profit Law would have been a tidier legislative solution. The fact that the Legislature could have done a more precise and meticulous job in crafting the overall statutory scheme does not detract from the Commissioner's power to use his sensible judgment and expertise through rulemaking to implement the obvious legislative will.

## VI

Appellants finally contend that the regulation is invalid on its face because it precludes insurers from the opportunity to earn a fair rate of return. Appellants explain that the Excess Profits Law compels insurers to refund any profits earned over 7.8 percent of premium (the 5.3 percent pre-tax operating profit allowed by the Clifford Formula and the additional 2.5 percent allowed by the Excess Profits Law) and the regulation requires insurers to exclude from the excess profits calculation mandatory expenses totalling 7.7 percent of premium. They urge that the residual maximum possible profit of 0.1 percent is not a constitutionally adequate rate of return.

The Commissioner responds that *State Farm v. State* guarantees an adequate return because the Court required the Commissioner to set rates high enough to allow a constitutionally adequate return. The Commissioner also questions appellants' assumption that the excess profits report accurately reflects an insurer's overall profitability. There are other ways to calculate a constitutionally adequate rate of return, such as by measuring return on net worth or equity. The Commissioner also claims that the excess profits calculation concerns itself solely with pre-tax operating profit, which leaves out "many essential elements of the calculation of total profitability," such as the impact of taxes, premium to surplus ratio, and income earned by an insurer on the investment of its surplus.

We decline to hold the regulation confiscatory on its face, although appellants make a decent argument that this may be so in certain applications. "Holdings of facial unconstitutionality are exceedingly rare" in the area of price controls. *State Farm v. State, supra,* 124 *N.J.* at 46, 590 *A.*2d 191. The insurers in *State Farm v. State* also made a persuasive prima facie showing that precluding insurers from considering the surtax and assessment as expenses in the rate-making process would inevitably produce a confiscatory rate of return. The argument was very similar to that raised here; the Clifford Formula allowed only a 3.5 percent rate of return in rate-making proceedings, yet the surtaxes and assessments took away 7.7 percent of the insurer's *expenses.* But the Court held that the command of the FAIR Act to insure a reasonable return, the inclusion of certain cost-saving measures in the FAIR Act, and flex-rating might be a sufficient response. *Id.* at 54–55, 61, 590 *A.*2d 191. The Court assumed that the Commissioner would take those steps necessary to assure a fair rate of return, and observed that insurers "are free to institute as-applied challenges" in the event the Court's confidence in the Commissioner was misplaced. *Id.* at 63, 590 *A.*2d 191. Indeed, our subsequent opinions have recognized that *State Farm* effectively disposes of arguments that the FAIR Act or regulations promulgated thereunder are facially confiscatory. *American Fire & Casualty Co. v. Department of Ins.,* 256 *N.J.Super.* 423, 426, 607 *A.*2d 196 (App.Div.1992); *In re Am. Reliance Ins. Co.,* 251 *N.J.Super.* 541, 555, 598 *A.*2d 1219 (App.Div.1991), *certif. denied,* 127 *N.J.* 556, 606 *A.*2d 369 (1992).

Affirmed.